WINFREE, Justice.
*757 I. INTRODUCTION
After a mother's and father's lengthy involvement with the Office of Children's Services (OCS), based primarily on alcohol abuse, their parental rights to their two minor children were terminated. Both parents appeal, challenging the superior court's admission of telephonic testimony and its perceived failure to consider guardianship as an alternative to termination. Because the parents were not prejudiced by the telephonic testimony and because there was no error in the court's consideration of a possible guardianship, we affirm the parental rights termination.
II. FACTS AND PROCEEDINGS
A. Early OCS Involvement
Dena M. and Dustin V. are the biological parents of Kelly, Shannon, Molly, and Kelton, who, at the time of the termination order, were 20, 18, 12, and 4, respectively.[1] Shannon was 17 at the beginning of the termination trial but turned 18 and aged-out of OCS custody before the termination decision. Only the minor children, Molly and Kelton, are the subjects of this appeal. The family members are affiliated with Native Village of Eagle (the tribe), and Molly and Kelton are Indian children within the meaning of the Indian Child Welfare Act (ICWA).[2]
OCS became actively involved with the family in 2006 after receiving a report about the parents' alcohol abuse. OCS received 15 reports of harm concerning alcohol abuse, domestic violence, and neglect prior to removing Kelly, Shannon, and Molly in 2008, before Kelton was born. A child in need of aid (CINA) adjudication was made based on risk of mental injury, neglect, and parental substance abuse.[3] Although Dena and Dustin "minimized" the severity of their issues with alcohol, they eventually completed the substance abuse component of their case plans and Dena completed an anger management course; based on this limited success, the couple regained custody of their children in mid-2011.
About a year later, in May and June 2012, Alaska State Troopers twice were called to help Dena recover from excessive alcohol intake. Later that year the three older children again were removed from their parents' home and placed in OCS custody. And in December 2013 Kelton was placed in OCS custody after having alcohol in his system at birth.
After this second removal Dena and Dustin moved frequently between Eagle and Fairbanks and were difficult to contact. Although they participated in substance abuse assessments, the OCS caseworker said that Dustin "laugh[ed] and sa[id] that he wouldn't pass a [urinalysis]." They eventually participated in a risk assessment with a licensed clinical social worker. Dena and Dustin acknowledged their "extensive history and use of alcohol and illegal substances" and history of being "mutually physically combative." About two years into this second removal, Dena began to engage in counseling. Following a trial home visit and Dena's limited engagement in treatment, the parents regained custody of the children in April 2016.
B. Current Case Proceedings
Just two months after Dena and Dustin regained custody, OCS learned that they had *758 been drinking and that Dustin and Shannon had been in a physical altercation. When an OCS caseworker went to Eagle to assess the situation, Dena and Dustin admitted they had been drinking; OCS thereafter implemented a new care and safety plan. The plan anticipated Dena and Dustin traveling and the children staying in Eagle. But the children's placements proved unsafe, and, although OCS attempted to work with the tribe to create a new safety plan while Dena and Dustin were away, "the tribe felt that the parents' behaviors were out of control and they could not come up with a plan to keep the children safe." OCS again took emergency custody of the children.
About a month later the tribe banished Dustin. The Eagle Village Council wrote in its banishment letter that Dustin had "broken trust and [his] word" by failing to be "on [his] best behavior and not involv[ing] [him]self in any activities that would cause [him] to lose custody of [his] children." Because OCS had removed the children "from [his] care twice in the past month and a half," the Council banished him "to ensure the health and safety of not only [his] children but Tribal members, Eagle Village Council members and Native Village of Eagle employees."
Dena and Dustin moved to Northway and infrequently communicated with OCS and their children. An OCS caseworker developed case plans for each parent in September 2016, although the plans were difficult to implement due to sporadic contact. The case plans required the parents to obtain substance abuse and psychological assessments, attend Alcoholics Anonymous meetings, and provide OCS basic contact information.
Dena and Dustin briefly returned to Eagle for the winter holiday season, but otherwise lived in Northway through summer 2017. They did not meaningfully engage in treatment during this time, but they did participate in visitation OCS arranged. After OCS filed a petition to terminate parental rights in June 2017, the parents returned to Eagle and began regularly attending counseling and treatment programs. The children's foster parent later testified that the parents attended informal visitation "[a]t least three to four times a week, some weeks more," and that they never visited while intoxicated. The foster parent testified to the "strong bond" between the children and parents.
Although Dena and Dustin were sober during visitation, they continued to abuse substances leading up to the January 2018 termination trial. In December 2017 Dustin physically assaulted Shannon; Dena attempted to intervene, and Dustin kicked her. OCS then suspended visitation with Molly and Kelton. Visitation resumed in January 2018, twice-weekly and regulated to ensure the parents were "sober and appropriate."
C. Termination Trial And Order
The termination trial took place over six days in January and March 2018. Over the parents' objection, the superior court permitted four Eagle witnesses to testify telephonically: the tribe's designated ICWA expert; a safety plan participant and former foster parent; a former Eagle public safety officer; and Molly and Kelton's then-foster parent. The court initially overruled the objection because "no objection was made at the pretrial conference." Dena's attorney observed that OCS had not filed a motion for telephonic testimony and that there had been no prior opportunity to object. The court then stated that Dena could call the witnesses in person "in [her] case if [she] so choose[s]." The court broadly ruled that the "distances here make it implicit that the Eagle witnesses are beyond ... what's contemplated by the rule."[4] The court ruled that the Eagle witnesses *759 could testify telephonically and stated: "If the parties want to subpoena witnesses and transport them to this court, they're free to do so." The court later clarified that "[a]ny prejudice can be remedied by the fact that there will be a two-month continuance. Any witnesses can be recalled."
The tribe's ICWA expert testified that excessive drinking and domestic violence are not tolerated by the tribe. She acknowledged that the tribe highly values families and expressed that the parents' "conduct does not match and adhere to the cultural norms of the Eagle Village." The court permitted the ICWA expert to testify about Molly's and Kelton's best interests from her "limited perspective, the cultural perspective," and it stated that the testimony would "not go to the ultimate best-interest question in this case." The ICWA expert advocated termination as being in the children's best interests, fearing that physical damage would result if the children were returned to their parents.
The safety plan participant testified that she had seen Dena and Dustin under the influence on "numerous occasions," including during a summer 2016 incident when Dustin "arrived at [her] house very under the influence" with Kelton, who "reeked of alcohol." The safety plan participant also testified about Dustin physically assaulting Shannon and described her injuries. The former public safety officer testified about his interactions with the family, recalling "screaming and yelling" and circumstances when the parents were under the influence while the children were present. Finally, the then-foster parent testified that Molly and Kelton have "strong connection[s]" with their parents. Dena and Dustin reserved their cross-examinations of both the safety plan participant and safety officer, but did not recall either to testify.
The court heard extensive testimony on whether guardianship, as opposed to termination, would be appropriate in this case. Under this alternative the foster parents would have been the children's guardians while the parents worked on treatment. Testimony conflicted whether guardianship or termination was in the children's best interests. Acknowledging that guardianship would allow visitation with the parents, the OCS caseworker expressed that it "leaves open the possibility of the parents coming back in and contesting and requesting dissolving of the guardianship on a yearly basis." The OCS caseworker also recounted Molly's strong preference against termination and adoption, noting that she had threatened to run away if her parents' rights were terminated.
Molly and Kelton's guardian ad litem (GAL) acknowledged that the parents "have shown and demonstrated appropriate parenting. They clearly have a bond with the kids." The GAL supported termination of parental rights for Kelton, as the parents "haven't been able to demonstrate stability when it comes to housing, employment, [and] where they're going to live even if they're in Eagle." But the GAL believed that guardianship would better serve Molly.[5] The superior court asked the GAL questions about guardianship, inquiring how it could be accomplished without termination and whether there was evidence that all parties were in agreement. The court also asked the tribal representative about consequences if Molly refused guardianship.
In June 2018 the court terminated Dena's and Dustin's parental rights to Molly and Kelton. The court found that Molly and Kelton were children in need of aid based on risk of physical harm, neglect, and parental alcohol addiction.[6] Finding that termination was in the children's best interests, the court did not expressly discuss guardianship but did acknowledge Molly's antipathy toward termination and adoption. The court stated that the "record suggests that this is a genuine preference and that [Molly] is of sufficient age and capacity to express this preference," but "[b]alanced against this preference is the complete inability of the parents to meet the children's needs and their complete inability to provide a stable satisfactory environment for the children." Ultimately the court found "no realistic other option" than *760 terminating parental rights. The court left Molly's preference against adoption for "future proceedings."
Dena and Dustin both appeal, contending that the superior court erred by allowing the four Eagle witnesses' telephonic testimony and by determining that termination was in their children's best interests without first considering guardianship.
III. STANDARD OF REVIEW
We generally review a superior court's decision allowing telephonic testimony for abuse of discretion.[7] But we "must disregard harmless errors that have no substantial effect on the rights of parties or on the outcome of the case."[8] We review the factual determination whether termination of parental rights is in a child's best interests for clear error.[9] "Findings of fact are clearly erroneous if a review of the entire record in the light most favorable to the party prevailing below leaves us 'with a definite and firm conviction that a mistake has been made.' "[10]
IV. DISCUSSION
A. Any Error In Allowing Telephonic Testimony Was Harmless.
Dena and Dustin argue that the superior court erred by allowing the four Eagle witnesses to testify telephonically, challenging the court's alleged failure to consider whether good cause or substantial prejudice existed as Alaska Civil Rule 99(a) requires in other civil proceedings.[11] They argue, additionally and alternatively, that allowing telephonic testimony violated their due process rights. It is not necessary for us to decide whether allowing telephonic testimony was proper statutorily or constitutionally, because we conclude that any possible error did not impact the parents' ability to present their case and was harmless.[12]
Although in-person testimony undoubtedly "has persuasive benefits absent from testimony given out of the presence of the trier of fact,"[13] allowing telephonic testimony is not necessarily "substantial prejudice" to warrant reversal.[14] Dena and Dustin fail to identify *761 any trial deficiencies demonstrating that they were substantially prejudiced. They argue that the telephonic testimonies were "critical to the court's resolution of key factual and legal questions." But even assuming this assertion's truth, criticality alone is insufficient to require in-person, rather than telephonic, testimony. In other contexts we have considered whether a witness's credibility is at issue to determine if in-person testimony should be required.[15]
Dena summarily argues in her reply brief that all four witnesses' "credibility was disputed," but she discusses only the tribal ICWA expert's credibility. Dena suggests that the ICWA expert testified based on materials Dena had not examined and that with live testimony she "could have then requested to review those materials prior to cross-examination, as opposed to waiting until after [the] testimony had concluded before being able to review them." Dena continues: "If [the ICWA expert] had testified in person, the trial court would have been able to observe how extensively [she] relied on those materials, as well as her demeanor and appearance, in determining whether and how much to credit her testimony and opinions."
But Dena failed to establish at the termination trial that the ICWA expert was, in fact, relying on documents during her actual testimony. The ICWA expert referred to "reports" she had received, but the transcript gives no indication that she was reading from documents rather than testifying from memory. Dena's attorney cross-examined the ICWA expert and established that the expert "ha[d] a file on this family," but the attorney did not clarify whether the expert had relied on that file while testifying or had reviewed it before testifying. Dena failed to establish that the expert was improperly relying on documents during her telephonic testimony and failed to object to the alleged improper reliance.
Even if the ICWA expert had improperly relied on documents, the superior court already had discounted the ICWA expert's testimony by accepting it from the "limited perspective, the cultural perspective of this witness." And even if Dena could have reviewed the ICWA expert's materials more extensively prior to cross-examination had the expert testified in person, the court allowed Dena to recall any witnesses after the trial's two-month continuance. The court stated that the "witnesses are not surprise witnesses. The facts are not surprise facts. Any prejudice can be remedied by the fact that there will be a two-month continuance." The ability to recall a witness may not mitigate potential prejudice in every case, but, even after having the chance to review the ICWA expert's materials, the parents did not recall her for cross-examination.
Dena additionally seems to recognize that evidence other than the challenged testimony may have aided the court's decision, stating, for example, that two telephonic testimonies "most directly supported" certain findings and that one was the "primary testimony" on another finding. But other than stating that the OCS caseworker's non-telephonic testimony was "brief and noncommital," Dena and Dustin ignore the multitude of other evidence presented, including certified court records, OCS reports, case plans, risk assessments, safety plans, and the tribe's letter and formal resolution of banishment. The court also heard non-telephonic testimony from former OCS caseworkers, substance abuse counselors, the tribal administrator, and the counselor who provided the parents' risk assessment.
Dena and Dustin fail to concretely explain what prejudice they sustained as a result of the witnesses' telephonic, rather than in-person, testimony. Because any alleged error did not prejudice the parties in this case, we hold *762 that the superior court did not err by allowing this telephonic testimony.
B. The Superior Court Did Not Err By Finding That Termination Of Parental Rights Was In The Children's Best Interests.
Dena and Dustin argue that the superior court's finding that termination of their parental rights was in their children's best interests "was insufficiently supported by factual findings and was also clearly erroneous." Dena also argues that, under AS 47.10.088(a), the court was required to resolve the guardianship question prior to termination.[16]
Alaska Statute 47.10.110 allows, but does not require, the superior court to appoint a guardian in a CINA proceeding when "it appears to the court that the welfare of a minor will be promoted by the appointment of a guardian." The superior court is required to consider guardianship in a termination of parental rights proceeding only "to the extent that the statute requires the court to order an arrangement that is in the child's best interest."[17] The superior court "may reasonably reject a request for guardianship if such a plan would be inconsistent with a child's need for stability and protection."[18]
Dena contends that evidence before the superior court "suggested that guardianship and retention of parental rights offered clear advantages over termination for the children." Even assuming this is accurate, the superior court at the very least implicitly considered this evidence.[19] The superior court heard testimony whether guardianship was in Molly's and Kelton's best interests and actively questioned its merits. But the court ultimately found that termination would better serve the children. The court's termination order emphasized that Dena's and Dustin's alcohol abuse left "no hope that either parent could be made capable of parenting either child at any time in the foreseeable future." The court found that "[a]s a result of a lifetime in and out of [OCS] custody, the children have developed a special need for stability, continuity, and permanency." After weighing Molly's preference against termination, the court found that the "balance of all the factors weighs in favor of concluding that it is in the best interest of the children to terminate parental rights. There is no realistic other option. [Molly]'s preference against adoption can be addressed in future proceedings."
Contrary to Dena's suggestion, the superior court clearly considered the evidence and Molly's and Kelton's specific needs. Agreeing with the testimony supporting termination rather than guardianship does not mean that the court erred.[20] The court heard and actively questioned testimony on guardianship, and the court implicitly considered guardianship as an option in its termination order. We therefore see no clear error in the court's decision on this issue.
We also disagree that the superior court erred by terminating parental rights before deciding whether guardianship or *763 adoption was in the children's best interests. In Fiona P. v. State, Department of Health & Social Services, Office of Children's Services , an unreported case, we explicitly considered and rejected this same argument.[21] We stated that "underlying this argument is the notion that if a guardianship were in the children's best interests, ... parental rights would not need termination."[22] We noted that although the superior court may consider alternative options, we have "never expressed ... a legal requirement" that courts consider guardianship before termination.[23]
Dena may be correct that there would be some "positive benefits for the children in maintaining a parental connection in this case," but the superior court considered those benefits in its termination order. It found "no hope that either parent could be made capable of parenting either child at any time in the foreseeable future." The court wrote detailed factual findings regarding OCS's long history with Dena and Dustin and thoroughly addressed why terminating parental rights was in the children's best interests. As OCS notes, the superior court is required to determine whether termination of parental rights is in the children's best interests; that is precisely what the court did in this case.
Dena finally argues that this court's interpretation of AS 47.10.088(a)"limits the court to terminating parental rights only where done for the purpose of facilitating or freeing the child for adoption or permanent placement." In A.B. v. State, Department of Health & Social Services we remanded a case because it was "unclear whether the superior court terminated [the parent's] parental rights 'for the purposes of freeing [the child] for adoption or other permanent placement.' "[24] But unlike in A.B. , the superior court in this case made clear that terminating parental rights was for the purpose of establishing a permanent placement. After stating that termination was the only "realistic ... option," the court stated that Molly's "preference against adoption can be addressed in future proceedings. The current placement is well suited to [Molly] and [Kelton]. They each have significant support from the community and the tribe." The court further stated that the "positive factors associated with their current placement provide a good foundation for permanency, with or without adoption for [Molly]." The court thus terminated parental rights with an eye expressly toward the permanent placement to follow.[25]
Reviewing the record in the light most favorable to OCS,[26] we hold that the superior court did not clearly err by finding that termination was in the children's best interests or otherwise err in its consideration of a possible guardianship.
V. CONCLUSION
For the foregoing reasons, we AFFIRM the superior court's termination of Dena's and Dustin's parental rights.

We use pseudonyms to protect the family members' privacy.

See 25 U.S.C. § 1903(4) (2012) (" 'Indian child' means any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe.").

See AS 47.10.011(8)(B), (9), (10).

CINA Rule 3(g)(1) provides that the superior court "may conduct any hearing with telephonic participation by one or more parties, counsel, witnesses, foster parents or out-of-home care providers, or the judge." A statewide presiding judge order augments this rule, stating that "[a]ny case participants, including out-of-home care providers, grandparents, tribes, parties, counsel, witnesses or the judge, who are not physically present at the court location may participate telephonically in any CINA hearing without court approval or prior notice." Presiding Judge Administrative Order, First Judicial Dist. Admin. Order No. 16-02; Second Judicial Dist. Admin. Order No. 1602; Third Judicial Dist. Admin. Order No. 16-06; Fourth Judicial Dist. Admin. Order No. 16-02 (effective July 1, 2016) (establishing statewide procedures for telephonic participation in CINA proceedings).

Despite this argument to the superior court, the GAL has joined in OCS's appellate brief "in full."

See AS 47.10.011(6), (9), (10).

Richard B. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs ., 71 P.3d 811, 817 (Alaska 2003).

Luther v. Lander , 373 P.3d 495, 499 (Alaska 2016) (quoting Pedersen v. Blythe , 292 P.3d 182, 184 (Alaska 2012) ); see also Alaska R. Civ. P. 61 ("The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties."); CINA Rule 1(e) (applying Civil Rule 61 to CINA proceedings).

Theresa L. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs. , 353 P.3d 831, 837 (Alaska 2015).

Barbara P. v. State, Dep't of Health & Soc. Servs. , Office of Children's Servs. , 234 P.3d 1245, 1253 (Alaska 2010) (quoting Brynna B. v. State, Dep't of Health & Soc. Servs. , Div. of Family & Youth Servs. , 88 P.3d 527, 529 (Alaska 2004) ).

Compare Alaska R. Civ. P. 99(a) (permitting telephonic participation in civil proceedings by "one or more parties, counsel, witnesses, or the judge ... in any hearing or deposition for good cause and in the absence of substantial prejudice to opposing parties"), with CINA Rule 3(g)(1) (providing superior court "may conduct any hearing with telephonic participation by one or more parties, counsel, witnesses, foster parents or out-of-home care providers, or the judge").

See Sarah A. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs. , 427 P.3d 771, 780 (Alaska 2018) (alterations in original) (quoting D.M. v. State, Div. of Family & Youth Servs. , 995 P.2d 205, 210 (Alaska 2000) ) (noting we have "denied due process claims where a parent failed to identify any 'plausible' basis for finding prejudice or did not theorize about how the requested procedural safeguard might 'potentially alter[ ] the findings about ... parental conduct' ").

Whitesides v. State, Dep't of Pub. Safety, Div. of Motor Vehicles , 20 P.3d 1130, 1137 (Alaska 2001). Other courts have recognized that in-person testimony aids in evaluating witness credibility, establishing witness identity, impressing formalities upon the witness, assuring no outside influences exist, and assuring no documents are referred to improperly. See, e.g. , Bonamarte v. Bonamarte , 263 Mont. 170, 866 P.2d 1132, 1134 (1994) ; Kelly v. Kelly , 445 S.W.3d 685, 694 (Tenn. 2014).

See Alaska R. Civ. P. 61 ("The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties."); CINA Rule 1(e) (applying Civil Rule 61 to CINA proceedings); see also Mary E. v. State , No. S-10705, 2003 WL 22994469, at *10 (Alaska Dec. 17, 2003) ("[Appellant's] examples [of prejudice from telephonic testimony] do not demonstrate 'substantial prejudice.' No doubt she was inconvenienced, but the court made substantial efforts to mitigate that inconvenience.").

See, e.g. , Richard B. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs. , 71 P.3d 811, 832 (Alaska 2003) (concluding denial of prisoner's request for transportation to attend his termination of parental rights trial did not violate his due process rights in part because his "credibility was not at issue on any material matter and therefore that any value added by in-person testimony ... would have been negligible"); cf. In re Hospitalization of Jacob S. , 384 P.3d 758, 765 (Alaska 2016) (concluding that appellant was not prejudiced by telephonic testimony in part because he did not challenge witness credibility).

Alaska Statute 47.10.088(a) provides that parental rights "may be terminated for purposes of freeing a child for adoption or other permanent placement if the court finds by clear and convincing evidence that" the child is a child in need of aid, that the parent has not remedied the conduct that made the child in need of aid, and that OCS has made reasonable reunification efforts.

Doug Y. v. State, Dep't of Health &Soc. Servs., Office of Children's Servs. , 243 P.3d 217, 229-30 (Alaska 2010) (quoting C.W. v. State, Dep't of Health & Soc. Servs. , 23 P.3d 52, 57 (Alaska 2001) ).

Grace L. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs. , 329 P.3d 980, 987 (Alaska 2014).

See Doug Y., 243 P.3d at 229-30 (holding that superior court "did not err in terminating parental rights and not establishing a guardianship" because it "implicitly rejected the guardianship proposal" in its best interests analysis); C.W. , 23 P.3d at 57 (holding that court properly terminated parental rights rather than institute guardianship after court "implicitly rejected the guardianship proposal").

See Hannah B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs. , 289 P.3d 924, 933 (Alaska 2012) ("Merely because the superior court reached a different conclusion than [the parent] desired does not constitute legal error.").

No. S-16301, 2017 WL 729765, at *2 (Alaska Feb. 22, 2017).

Id.

Id.

7 P.3d 946, 953-54 (Alaska 2000) (quoting AS 47.10.088(a) ).

See AS 47.10.088(a).

See Barbara P. v. State, Dep't of Health & Soc. Servs. , 234 P.3d 1245, 1253 (Alaska 2010) (stating we review fact findings in light most favorable to party prevailing below).